GREEN PARK INN, INC., Plaintiff v. GARY T. MOORE and wife, GAIL O. MOORE, GMAFCO, LLC, and FIRST UNION NATIONAL BANK OF SOUTH CAROLINA, Defendants

No. COA01-268

(Filed 2 April 2002)

**1. Mortgages— lease/purchase agreement—anti-deficiency statute**

The Anti-Deficiency Statute did not apply to a long term lease with an option to purchase where defendants argued that the documents and the conduct of the parties indicated a purchase money mortgage subject to the Anti-Deficiency Statute. There was neither an instrument of debt nor a securing instrument stating on its face that the transaction was a purchase money mortgage. N.C.G.S. § 45-21.38.

**2. Damages— liquidated—provision enforceable**

A liquidated damages provision in a lease was enforceable where the damages in the event of a breach would have been difficult to ascertain at the time the parties entered into their agree-

ment and the statements about the negotiations offered by defendants to show that the amount was unreasonable were insufficient to raise a genuine issue of material fact.

### 3. Contract— lease—disguised sale—meeting of minds

The trial court did not err by not granting summary judgment for defendants in an action arising from breach of a lease/purchase agreement where defendants contended that there was no meeting of the minds in that defendants understood the transaction to be a sale disguised as a lease. The tax consequences of the agreement may not constitute an essential term because they do not relate to the rights and obligations of the parties to each other.

### 4. Judgments— interest—payment from trust account

The trial court did not err by awarding interest in an action arising from a breached lease/purchase agreement, but liability for the interest may only be assessed against defendants Moore and GMAFCO, not First Union, which the agreement required to retain assigned trust account assets until any dispute was resolved.

Appeal by defendants from order entered 25 October 2000 by Judge Ronald K. Payne in Buncombe County Superior Court. Heard in the Court of Appeals 9 January 2002.

*Adams, Hendon, Carson, Crow & Saenger, P.A., by George W. Saenger, for plaintiff-appellee.*

*Matney & Associates, P.A., by David E. Matney, III, for defendant-appellants.*

HUDSON, Judge.

Gary T. and Gail O. Moore, GMAFCO, LLC, and First Union National Bank of South Carolina (collectively, "Defendants") appeal from an order granting summary judgment in favor of Green Park Inn, Incorporated. We affirm.

Allen and Patsy McCain are the owners of Green Park Inn, Incorporated ("Plaintiff"). Through Plaintiff, the McCains operated the Green Park Inn ("the Inn"), a hotel in Blowing Rock, North Carolina. Beginning in the Summer of 1996, Plaintiff negotiated with Defendants Gary and Gail Moore for the sale of the Inn.

In August 1996, Plaintiff as seller, and the Moores as buyers, signed a document entitled "Offer to Purchase and Contract for Sale and Purchase" ("Sales Contract"). The purchase price was $2,600,000. Paragraph XII of the Sales Contract provided for a purchase money mortgage. Additionally, Paragraph XII required, *inter alia*, that the Moores pledge as additional security for the loan $1,000,000 worth of assets held in trust with the First Union National Bank of South Carolina ("First Union") and that the Moores personally guarantee the loan.

Paragraph XXXXV of the Sales Contract provided an alternative form for the transaction. Paragraph XXXXV states as follows:

Notwithstanding any provision in any other Article of this Offer to Purchase and Contract For Sale and Purchase to the contrary, Seller may at its option elect not to pay at Closing the existing indebtedness (hereinafter the "Existing Debt") . . . in which event the structure and form of the transaction shall be as set forth in this Article XXXXV. It is the intent of the parties that if the structure of the transaction is as set forth in this Article, the financial substance of the transaction as between the parties and as between each party and all taxing authorities shall be the same as if the structure and form as set forth in this Article were not utilized. The terms and conditions of any documents described in this Article shall be those such as to fulfill the terms and the structure described below. If so elected by Seller the structure shall be as follows.

Paragraph XXXXV then went on to outline the alternative form of the transaction. At a "First Closing," the parties were to enter into a contract for purchase of the property with a closing date—the "Second Closing"—to occur within 30 days after the Existing Debt had been paid in full. Additionally, at the First Closing, the parties would enter into a lease for a term of three years or until the Second Closing, with the possibility, at the seller's option, of extending the lease for an additional three years. Paragraph XXXXV of the Sales Contract also provided that "[t]he parties covenant and agree, for all income tax reporting purposes, to report this transaction as a sale as of the date of First Closing, with the rental payments as payments of principal and interest as set forth herein and as a foreclosure in the event of a termination of Buyer's rights pursuant to default under the Lease."

Shortly after Plaintiff executed these documents in August 1996, Mr. McCain's accountant advised him that the transaction would be

considered a sale of the Inn by the Internal Revenue Service, with adverse tax consequences. In September 1996, McCain hired a North Carolina law firm to restructure the transaction. In October 1996, the parties executed a set of documents, including a Lease Agreement, an Option to Purchase, and a Security Deposit Assignment Agreement for Trust Account Collateral ("Security Deposit Agreement").

The Lease Agreement was executed by Plaintiff as lessor and GMAFCO, the Moores' limited liability company, as lessee. It provided for a lease term of eleven and one-half years with monthly rental payments due according to the following schedule:

(1) May 1st, 1997 through December 1st, 2001—monthly payments each in the amount of Twenty Thousand Eight Hundred Sixteen Dollars and 04/100 ($20,816.04);

(2) January 1st, 2002 through April 1st, 2002—monthly payments each in the amount of Twenty Two Thousand Three Hundred Seventy-Four Dollars and 04/100 ($22,374.04);

(3) May 1st, 2002 through June 1st, 2008—monthly payments each in the amount of Twenty Four Thousand Five Hundred Ninety One and 01/100 ($25,491.01).

The Lease Agreement was accompanied by an Option to Purchase the Inn for $1,800,000, which could be exercised on or after 1 January 2008. The Option to Purchase contained a provision stating: "Parties covenant and agree, for all income tax reporting purposes, to report this transaction as a sale as of the date of the Lease, with the rental payments as payments of principal and interest as set forth herein, and as a foreclosure in the event of a termination of Buyer's rights pursuant to default."

Section Seventeen of the Lease Agreement included a provision for liquidated damages. This section provided that in case of a default by GMAFCO, Plaintiff would be entitled to $500,000 in liquidated damages. The accompanying Security Deposit Agreement provided that, upon stated terms and conditions, the Moores "as Assignor, hereby assigns, pledges and grants as Security Deposit to [Plaintiff], as Assignee, all of [Assignor's] and [Assignor's] estate's beneficial interest in the principal and income from Five Hundred Thousand Dollars ($500,000.00) of the Trust Account assets" held by First Union.

GREEN PARK INN, INC. v. MOORE

[149 N.C. App. 531 (2002)]

GMAFCO defaulted on the February 2000 rent. Pursuant to the terms of the Lease Agreement and the Security Deposit Agreement, Plaintiff, by letter dated 28 February 2000, gave GMAFCO notice and an opportunity to cure the default. GMAFCO made no further payments and returned possession of the property to Plaintiff. In March 2000, Plaintiff advised First Union of the default and made demand for the security deposit. First Union did not tender the security deposit. Instead, First Union advised Plaintiff that the Moores had contested payment of the deposit, and that First Union had frozen the assets pending resolution of the dispute.

Plaintiff filed suit against the Moores, GMAFCO, and First Union on 6 April 2000 to obtain the $500,000 security deposit. In their answer, the Moores and GMAFCO raised as defenses, *inter alia*, that North Carolina's Anti-Deficiency Statute, N.C. Gen. Stat. § 45-21.38 (1999), prohibited the payment of the $500,000, because the Lease was a disguised sale and the $500,000 would be a deficiency judgment; and the Lease provision requiring payment of $500,000, although labeled a liquidated damages provision, was in fact an unenforceable penalty provision. In its answer, First Union acknowledged that it was the stakeholder of the $500,000 it held in trust. First Union requested that the court enter an order directing First Union to whom it should deliver the stake, at no cost to First Union.

Plaintiff filed a motion for summary judgment on 5 October 2000, which the trial court granted. The court's order provides in relevant part that "Defendants, jointly and severally, are ordered to pay to Plaintiff the Five Hundred Thousand ($500,000.00) Dollars maintained in the account of Defendant Gary T. Moore and wife, Gail O. Moore at Defendant First Union National Bank of South Carolina" and "Plaintiff is entitled to interest at the legal rate from March 14, 2000." Defendants appeal.

I.

[1] In their first assignment of error, Defendants maintain that the trial court erred in granting Plaintiff's motion for summary judgment. Defendants do not dispute that GMAFCO breached the agreement. They argue that the agreement was in effect a purchase money mortgage, subject to North Carolina's Anti-Deficiency Statute. Defendants contend that, as a result, Plaintiff's only remedy is recovery of the property, and the Security Deposit Agreement is unenforceable. We disagree.

The Anti-Deficiency Statute provides as follows:

> In all sales of real property by mortgagees and/or trustees under powers of sale contained in any mortgage or deed of trust executed after February 6, 1933, or where judgment or decree is given for the foreclosure of any mortgage executed after February 6, 1933, to secure to the seller the payment of the balance of the purchase price of real property, the mortgagee or trustee or holder of the notes secured by such mortgage or deed of trust shall not be entitled to a deficiency judgment on account of such mortgage, deed of trust or obligation secured by the same: Provided, said evidence of indebtedness shows upon the face that it is for balance of purchase money for real estate: Provided, further, that when said note or notes are prepared under the direction and supervision of the seller or sellers, he, it, or they shall cause a provision to be inserted in said note disclosing that it is for purchase money of real estate; in default of which the seller or sellers shall be liable to purchaser for any loss which he might sustain by reason of the failure to insert said provisions as herein set out.

N.C.G.S. § 45-21.38.

Defendants argue that the transaction—a long-term lease followed by an option to purchase—was a *de facto* sale and was "substantively equivalent to purchase money financing." Defendants devote much of their brief to their contention that the parties intended their transaction to be a sale, as evidenced by the documents and their conduct. We believe, however, that regardless of how we characterize their transaction or the parties' intents, the Anti-Deficiency Statute simply does not apply here.

Defendants rely on cases decided by our Supreme Court to argue that the Anti-Deficiency Statute is to be broadly interpreted, and thus, the Lease Agreement should be treated as a purchase money mortgage under that statute, with the Lease viewed as evidence of indebtedness and security. In *Realty Co. v. Trust Co.*, 296 N.C. 366, 250 S.E.2d 271 (1979), our Supreme Court eschewed a literal reading of the statute, stating that the Court was "compelled to construe the statute more broadly." *Id.* at 373, 250 S.E.2d at 275. In order to effectuate the intent of the Legislature, the Court held that the statute, in addition to abolishing deficiency judgments, prohibits creditors in a purchase-money mortgage transaction from suing on the note in lieu of accepting reconveyance of the property. *See id.*; *see also Barnaby*

**GREEN PARK INN, INC. v. MOORE**

[149 N.C. App. 531 (2002)]

*v. Boardman*, 313 N.C. 565, 566, 330 S.E.2d 600, 601 (1985) (holding that "the holder of a promissory note given by a buyer to a seller for the purchase of land and secured by a deed of trust embracing such land may [not] release his security and then sue on the note").

In *Adams v. Cooper*, 340 N.C. 242, 460 S.E.2d 120 (1995), the Court held that the Anti-Deficiency Statute "bars an action against the guarantors of a purchase money note to recover the debt for the balance of the purchase price represented by the note." *Id.* at 243, 460 S.E.2d at 121. Again noting that the statute should be broadly construed to effectuate the Legislature's intent, the Court stated that "[o]ur cases interpreting and applying the anti-deficiency statute have consistently held that the 1933 General Assembly intended it to prevent any suit on such a purchase money obligation other than one to foreclose upon the real property securing the obligation." *Id.* at 244, 460 S.E.2d at 121.

It should be noted that in each of the transactions at issue in these cases, the buyer had executed a note secured by a deed of trust, and the documents of the transaction made clear that the parties had engaged in purchase money financing. *See id.* at 243, 460 S.E.2d at 120; *Barnaby*, 313 N.C. at 566, 330 S.E.2d at 601; *Realty Co.*, 296 N.C. at 366-67, 250 S.E.2d at 272. None of the documents in the case before us, however, purports to be an instrument of debt or a securing instrument, and none of the documents contain a statement that the property served as security for the balance of its purchase price.

The statute expressly states that its application is limited to transactions where the "evidence of indebtedness *shows upon the face* that it is for balance of purchase money for real estate." N.C.G.S. § 45-21.38 (emphasis added). We interpret this language as precluding the reading of the statute which Defendants have requested. Indeed, our Supreme Court has stated that "the manifest intention of the Legislature was to limit the creditor to the property conveyed when the note and mortgage or deed of trust are executed to the seller of the real estate *and the securing instruments state that they are for the purpose of securing the balance of the purchase price.*" *Realty Co.*, 296 N.C. at 370, 250 S.E.2d at 273 (emphasis added). We hold that the Anti-Deficiency Statute does not apply to this transaction, in which there is neither an instrument of debt nor a securing instrument stating on its face that the transaction is a purchase money mortgage. *See Friedlmeier v. Altman,* 93 N.C. App. 491, 496, 378

S.E.2d 217, 220 (1989) (rejecting argument that parties' agreement must state that transaction is purchase money transaction and observing that "[b]oth the note and deed of trust recited on their faces that they were for the balance of purchase money for real estate, as required by the statute").

[2] Defendants next argue that even if the agreement was in fact a lease, the purported liquidated damages provision was an unenforceable penalty provision. Again, we disagree.

> "*Liquidated damages* are a sum which a party to a contract agrees to pay or a deposit which he agrees to forfeit, if he breaks some promise, and which, having been arrived at by a good-faith effort to estimate in advance the actual damage which would probably ensue from the breach, are legally recoverable or retainable . . . if the breach occurs. A *penalty* is a sum which a party similarly agrees to pay or forfeit . . . but which is fixed, not as a pre-estimate of probable actual damages, but as a *punishment*, the threat of which is designed to prevent the breach, or as *security* . . . to insure that the person injured shall collect his actual damages."

*Knutton v. Cofield*, 273 N.C. 355, 361, 160 S.E.2d 29, 34 (1968) (quoting McCormick, *Damages* § 146 (1935)) (alterations in original). A penalty clause will not be enforced. *See id.* at 360-61, 160 S.E.2d at 34.

According to our Supreme Court:

> Whether a stipulated sum will be treated as a penalty or as liquidated damages may ordinarily be determined by applying one or more aspects of the following rule: "[A] stipulated sum is for liquidated damages only (1) where the damages which the parties might reasonably anticipate are difficult to ascertain because of their indefiniteness or uncertainty and (2) where the amount stipulated is either a reasonable estimate of the damages which would probably be caused by a breach *or* is reasonably proportionate to the damages which have actually been caused by the breach."

*Id.* at 361, 160 S.E.2d at 34 (quoting 22 Am. Jur. 2d *Damages* § 214). "The question whether damages are difficult of ascertainment is to be determined by a consideration of the status of the parties at the time they enter into the contract, and not at the time of the breach." 22 Am. Jur. 2d *Damages* § 700, at 757 (1988). "Where the damages result-

ing from a breach of contract cannot be measured by any definite pecuniary standard, as by market value or the like, but are wholly uncertain, the law favors a liquidation of the damages by the parties themselves; and where they stipulate for a reasonable amount, the agreement will be enforced." *Knutton*, 273 N.C. at 362, 160 S.E.2d at 35 (internal quotation marks omitted).

We agree with Plaintiff that damages in the event of a breach would have been difficult to ascertain at the time the parties entered into their agreement. Mr. McCain explained in his affidavit that

> [t]he Green Park Inn is an old structure in which is operated a full-service hotel. We had worked very hard over the 14 years we owned the Green Park Inn to develop the business and its reputation for quality and service. The value of the building was minimal without the added value of the ongoing concern of a first class hotel and restaurant. Concern as expressed in the liquidated damages clause was that in the event of a default the value of the going concern portion could be seriously jeopardized and lost if the Inn was shut down. Also, a default would likely cause my wife and I to return to salvage the Inn operation.

The parties agreed to the following in the liquidated damages clause of the Lease Agreement:

> Allen and Pat McCain, the only two shareholders of lessor, have actively worked in the day to day operation of the hotel for the past fourteen years, and have steadily built up the clientele, reputation and physical plant of the hotel, and, correspondingly, the revenues/profits of the hotel. In addition, Allen and Pat McCain are 64 and 55 years old respectively, and that both retired from the business after this lease was agreed to. The McCains have retired to Florida, and would have to relocate back to Blowing Rock for extended periods of time if they are forced out of retirement to take over operation of the hotel. The parties agree to the following items which will be included in lessor's damages:
>
> (a) restoration of the physical plant;
>
> (b) lost lease payments owed to lessor which will not be paid because of lessee's breach with due consideration having been given to lessor's obligation to mitigate damages;
>
> (c) harm to the reputation of the hotel, which will have to be remedied by lessor;

> (d) interruption of business damages caused by the neces-
> sity of lessor having to hire new employees to recommence
> operations.

While some of the items listed in the liquidated damages provision
are not indefinite or uncertain, others, such as the harm to the hotel's
reputation or the cost to the McCains of being forced out of retire-
ment, clearly would have been difficult to ascertain at the time the
Lease Agreement was signed. Thus, the first prong of the *Knutton*
test is satisfied.

Whether a liquidated damages amount is a reasonable estimate of
the damages that would likely result from a default is a question of
fact. *See Coastal Leasing Corp. v. T-Bar Corp.*, 128 N.C. App. 379,
384-85, 496 S.E.2d 795, 799 (1998) (affirming grant of summary judg-
ment because the liquidated damages clause protected plaintiff's
expectation interest and there was "no evidence that plaintiff exer-
cised a superior bargaining position in the negotiation of the liqui-
dated damages clause, [and therefore] no genuine issue of material
fact exist[ed] as to its reasonableness"). In support of its motion for
summary judgment, Plaintiff submitted McCain's affidavit, in which
he stated that, after he and his wife were forced out of retirement and
back to Blowing Rock to operate the hotel, "[t]he estimate of
$500,000.00 as the fair and reasonable estimate to measure the dam-
ages suffered by us in the event of default has proven to be just that
fair and reasonable." Additionally, the Lease Agreement states that
"[t]he parties have agreed that the sum of Five Hundred Thousand
Dollars ($500,000.00) represents a fair and reasonable estimate and
measure of the damages to be suffered by lessor in the event of
default by lessee." Defendants have proffered no evidence to show
the liquidated damages amount was unreasonable. Defendants' only
evidence in the record on this issue is the affidavit of Gary Moore, in
which he states that

> [t]here was never any discussion of which I am aware as to what
> amount of liquidated damages would be reasonable, or whether
> or not the damages in the event of default could be determined or
> calculated. Mr. McCain just demanded the various requirements
> be in the documents, and I agreed to insert them in the docu-
> ments, as I did not think the provisions were enforceable.

In his affidavit, Greg Justus, the real estate broker who worked for
the Moores, repeated that

[t]here was never any discussion of which I am aware as to what amount of liquidated damages would be reasonable, or whether or not the damages in the event of default could be determined or calculated. Mr. McCain just demanded the various requirements be in the documents, and Mr. Moore agreed to insert them in the documents.

These statements are insufficient to raise a genuine issue of material fact regarding whether the liquidated damages amount was reasonable. Therefore, the trial court did not err in granting summary judgment in favor of Plaintiff.

## II.

[3] In their second assignment of error, Defendants assert that the trial court erred in failing to grant summary judgment in their favor. North Carolina Rule of Civil Procedure 56 provides that "[s]ummary judgment, when appropriate, may be rendered against the moving party." N.C. Gen. Stat. § 1A-1, Rule 56(c) (Supp. 2000).

We have already rejected Defendants' argument that the Anti-Deficiency Statute bars Plaintiff's recovery of the security deposit and their argument that the liquidated damages clause is unenforceable. The trial court did not err in failing to grant summary judgment for Defendants on these grounds.

Defendants argue in the alternative that if Plaintiff intended the transaction to be a lease, then there was no meeting of the minds as to an essential term of their agreement because Defendants understood that the transaction was a sale disguised as a lease. According to Defendants, the characterization of the transaction is an essential term because "[w]hether this transaction was a lease or a sale disguised as a lease has consequences of tax reporting and enforceability of deficiency actions such as action on the Security Deposit Agreement." Defendants conclude that, because there was no meeting of the minds, a valid contract does not exist.

We disagree that the tax consequences of the agreement may constitute an essential term, because the tax consequences do not relate to the parties' rights and obligations *vis a vis* each other. *See Zanone v. RJR Nabisco*, 120 N.C. App. 768, 772, 463 S.E.2d 584, 587 (1995) ("The word 'agreement' implies the parties are of one mind—all have a common understanding of the rights and obligations of the others— there has been a meeting of the minds." (internal quotation marks omitted)), *disc. review denied*, 342 N.C. 666, 467 S.E.2d 738 (1996).

Defendants cite no authority for the proposition that if the parties disagree on the tax consequences of their agreement, then their agreement is void. We have already determined that the Anti-Deficiency Statute does not apply to this agreement, and so we conclude that the argument that the characterization of the transaction is relevant to the enforceability of deficiency actions has no merit. Accordingly, the trial court did not err in failing to grant summary judgment in favor of Defendants.

III.

**[4]** In the third and final assignment of error, Defendant First Union asserts that the grant of summary judgment in favor of Plaintiff is erroneous to the extent that it obligates First Union to pay any interest or costs in excess of the assigned Trust Assets that it holds. We agree that First Union is not liable for interest on the award.

"In an action for breach of contract, . . . the amount awarded on the contract bears interest from the date of breach." N.C. Gen. Stat. § 24-5(a) (1999). Thus, the trial court did not err in awarding interest as of the date of the breach, which the court determined had occurred on 14 March 2000. However, the court's order states that "Plaintiff is entitled to interest at the legal rate from March 14, 2000," without specifying which defendants are liable for payment of the interest.

The Security Deposit Agreement provides that "[First Union] shall incur no liability so long as it complies with the terms hereof. In the event of a dispute between [Plaintiff] and [GMAFCO] or [the Moores] over the release or reversion of the assigned Trust Account Assets[, First Union] shall retain the assigned Trust Account assets until the dispute is resolved." We see nothing in the record to suggest that First Union has not complied with the terms of the Security Deposit Agreement. Therefore, First Union, consistent with the Security Deposit Agreement, is required only to release the assigned Trust Account assets, but is not liable for any of the interest. We conclude that the trial court did not err in awarding interest, but that liability for the payment of interest may be assessed only against the Moores and GMAFCO, not against First Union.

Affirmed.

Judges WYNN and THOMAS concur.